# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 12, 2010　　　　　Decided June 22, 2010

No. 09-1075

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,
APPELLANT

v.

LIBRARIAN OF CONGRESS,
APPELLEE

NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC.,
SONGWRITERS GUILD OF AMERICA, AND NASHVILLE
SONGWRITERS ASSOCIATION INTERNATIONAL,
INTERVENORS

———

Consolidated with 09-1205

———

On Appeal of an Order of the Copyright Royalty Board

———

*Paul M. Smith* argued the cause for appellant. With him
on the briefs were *Steven R. Englund*, *Jared O. Freedman*,
*Lindsay C. Harrison*, *Steven M. Marks*, *Susan B. Chertkof*,
and *Scott A. Zebrak*. *David A. Handzo* entered an appearance.

*Kelsi Brown Corkran*, U.S. Department of Justice, argued
the cause for appellee. With her on the brief were *Tony West*,

Assistant Attorney General, and *Scott R. McIntosh*, Attorney. *Sarang V. Damle*, Attorney, entered an appearance.

*Jay Cohen* argued the cause for intervenors National Music Publishers' Association, Inc., et al. With him on the brief were *Lynn B. Bayard*, *David W. Brown*, *Jay Rosenthal*, Senior Vice-President & General Counsel, National Music Publishers' Association, Inc., *Kathryn E. Wagner*, Vice President & Counsel, National Music Publishers' Association, Inc., *Charles J. Sanders*, Special Counsel, Songwriters Guild of America, and *Carl W. Hampe.*

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: By law, the Copyright Royalty Board sets the terms and rates for copyright royalties when copyright owners and licensees fail to negotiate terms and rates themselves. As part of its statutory mandate, the Board sets royalty terms and rates for what is known as the § 115 statutory license. That license allows individuals to make their own recordings of copyrighted musical works for distribution to the public without the consent of the copyright owner.

In carrying out its statutory responsibilities under 17 U.S.C. § 115, the Board instituted a 1.5 percent per month late fee for late royalty payments. It also implemented a penny-rate royalty structure for cell phone ringtones, under which copyright owners receive 24 cents for every ringtone sold using their copyrighted work.

The Recording Industry Association of America challenges those two aspects of the Board's decision, arguing that they were arbitrary and capricious for purposes of the Administrative Procedure Act. We conclude that the Board's decision was reasonable and reasonably explained. We therefore affirm the Board's determination.

I

A

Most songs played on the radio, sold on CDs in music stores, or digitally available on the Internet through services like iTunes embody two distinct copyrights – a copyright in the "musical work" and a copyright in the "sound recording." *See* 17 U.S.C. § 102. The musical work is the musical composition – the notes and lyrics of the song as they appear on sheet music. The sound recording is the recorded musical work performed by a specific artist.

Although almost always intermingled in a single song, those two copyrights are legally distinct and may be owned and licensed separately. One party might own the copyright in the words and musical arrangement of a song, and another party might own the copyright in a particular artist's recording of those words and musical notes.

This case involves licenses in a limited category of copyrighted musical works – as opposed to sound recordings. Section 115 of the Copyright Act allows an individual to make and distribute phonorecords (that is, sound recordings) of a copyrighted musical work without reaching any kind of agreement with the copyright owner. That right does not include authorization to make exact copies of an existing

sound recording and distribute it; if a musical work has been recorded and copyrighted by another artist, a licensee "may exercise his rights under the [§ 115] license only by assembling his own musicians, singers, recording engineers and equipment, etc. for the purpose of recording anew the musical work that is the subject of the [§ 115] license." 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.04[A], at 8-58.5 (2009). For example, a § 115 licensee could pull together a group of musicians to record and sell a cover version of Bruce Springsteen's 1975 hit *Born to Run*, but that licensee could not make copies of Springsteen's recording of that song and sell them.

The § 115 licensing regime operates in a fairly straightforward manner. When a copyright owner distributes work "to the public," § 115's provisions are triggered. 17 U.S.C. § 115(a)(1). Once that occurs, anyone may "obtain a compulsory license to make and distribute phonorecords of the work" under § 115 so long as the "primary purpose in making [the] phonorecords is to distribute them to the public for private use." *Id.* Assuming the copyright has been registered with the Copyright Office, the licensee owes the copyright owner a royalty for every phonorecord "made and distributed in accordance with the [§ 115] license." *Id.* § 115(c)(2). For purposes of the Copyright Act, a phonorecord is "distributed" – and an obligation to pay the copyright owner a royalty created – when "the person exercising the [§ 115] license has voluntarily and permanently parted with" the phonorecord. *Id.* In other words, the licensee's sale of its recording of the copyright owner's work triggers the royalty payment obligation. *See* NIMMER § 8.04[H][1], at 8-77.

Because the § 115 license issues without any agreement between the copyright owner and the licensee, the system

needs a mechanism to figure out how much the licensee owes the copyright owner and what the terms for paying that rate should be. Although that mechanism has changed over time, the Copyright Royalty Board currently serves as the rulemaking body for this system. *See generally* Procedural Regulations for the Copyright Royalty Board, 70 Fed. Reg. 30,901 (May 31, 2005) (discussing the history of royalty ratemaking). The Board is a three-person panel appointed by the Librarian of Congress and removable only for cause by the Librarian.[1] The Board sets the terms and rates for copyright royalties when copyright owners and licensees fail to negotiate terms and rates themselves. *See* NIMMER § 7.27[C], at 7-243.

As relevant here, the Copyright Act requires the Board to set "reasonable terms and rates" for royalty payments made under the § 115 license when the parties to the license fail to do so. 17 U.S.C. § 801(b)(1). When establishing terms and rates under that license, the Copyright Act requires the Board to balance four general and sometimes conflicting policy objectives: (1) maximizing the availability of creative works to the public; (2) providing copyright owners a fair return for their creative works and copyright users a fair income; (3) recognizing the relative roles of the copyright owners and users; and (4) minimizing any disruptive impact on the industries involved. *Id.* § 801(b)(1)(A)-(D).

---

[1] RIAA has not raised a constitutional challenge to the method of appointment of the members of the Copyright Royalty Board. *Cf. Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755-56 (D.C. Cir. 2009); *SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220, 1226-27 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

At specified intervals, the Board holds ratemaking proceedings for licenses issued under the Copyright Act. Section 115 ratemaking proceedings can occur every five years "or at such other times as the parties have agreed." *Id.* § 804(b)(4).

B

In 1996, the parties with an interest in the § 115 license (such as the Recording Industry Association of America, the Songwriter's Guild of America, and the National Music Publishers' Association) agreed on various terms and rates for the compulsory license. They also agreed that the settlement with respect to those terms and rates would expire 10 years later. In 2006, after the parties found they could not reach a new compromise, the Board instituted proceedings to set certain terms and rates governing the operation of the § 115 license. The process was long and complicated, involving 28 days of live testimony, more than 140 exhibits, and more than 340 pleadings, motions, and orders. *See* Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 4510, 4511 (Jan. 26, 2009).

When the Board published its final determination from those proceedings in 2009, it announced one new § 115 licensing term and two new § 115 royalty rates. First, the Board instituted a late payment of 1.5 percent per month for overdue royalties, measured from the date payment is due. Second, it established a royalty rate for cellular phone ringtones – a sound cell phones can make when they ring that often samples a popular song. It set the rate at 24 cents per

ringtone sold.[2]  Third, with respect to physical phonorecords (like CDs) and permanent digital downloads (like those purchased from iTunes), the Board set the § 115 royalty rate at the greater of 9.1 cents per song or 1.75 cents per minute of playing time.

The Recording Industry Association of America, known as RIAA, is a trade association representing companies that create, manufacture, and distribute sound recordings.  It participated as a party in the § 115 licensing proceedings. After the Board issued its determination, RIAA filed a motion for rehearing.  The Board denied the motion.

RIAA now appeals two aspects of the Board's ruling: (1) the imposition of a 1.5 percent per month late fee and (2) the imposition of a penny-rate royalty structure for ringtones at 24 cents per ringtone sold.

RIAA does not contend that the Board contravened any specific statutory limit.  In other words, this is a *State Farm* case, not a *Chevron* case.  The Board's rulings are subject to review in this Court under the arbitrary and capricious standard of the Administrative Procedure Act.  17 U.S.C. § 803(d)(3); *see* 5 U.S.C. § 706(2)(A).  As a general matter, our review under that standard is deferential.  *See FCC v. Fox Television Stations*, 129 S. Ct. 1800, 1810 (2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  And we give "substantial deference" to the ratemaking decisions of the Board because Congress

---

[2] In 2006, the Register of Copyrights ruled that ringtones are phonorecords that fall within the scope of the § 115 license. Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceedings, 71 Fed. Reg. 64,303 (Nov. 1, 2006).

expressly tasked it with balancing the conflicting statutory objectives enumerated in the Copyright Act. *SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220, 1225 (D.C. Cir. 2009). "To the extent that the statutory objectives determine a range of reasonable royalty rates that would serve all [the] objectives adequately but to differing degrees, the [Board] is free to choose among those rates, and courts are without authority to set aside the particular rate chosen by the [Board] if it lies within a zone of reasonableness." *Recording Indus. Ass'n of America v. Copyright Royalty Tribunal*, 662 F.2d 1, 9 (D.C. Cir. 1981) (internal quotation marks omitted).

II

We first consider RIAA's challenge to the 1.5 percent late fee.

The Copyright Act authorizes the Board to impose a late fee for § 115 royalty payments: "A determination of the Copyright Royalty [Board] may include terms with respect to late payment, but in no way shall such terms prevent the copyright holder from asserting other rights or remedies provided under this title." 17 U.S.C. § 803(c)(7).

The factors listed in § 801(b)(1) of the Copyright Act govern the Board's decision to impose a late fee, as well as its determination of the amount of that fee. Recall that those factors include: (1) maximizing the availability of creative works to the public; (2) providing copyright owners a fair return for their creative works and copyright users a fair income; (3) recognizing the relative roles of the copyright owners and users; and (4) minimizing any disruptive impact on the industries involved. Applying those broad and rather amorphous factors, the Board concluded that the 1.5 percent

late fee comports with the statutory objectives because it strikes a balance "between providing an effective incentive to the licensee to make payments timely on the one hand and not making the fee so high that it is punitive on the other hand." Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 4510, 4528 (Jan. 26, 2009) (internal quotation marks omitted).

RIAA levies several challenges to the late fee. First, RIAA argues that the Board must set royalty terms and rates that track those found in the marketplace and that the Board failed to do so here. Second, RIAA asserts that the late fee is unnecessary in the § 115 licensing context because copyright owners possess a termination right that can be invoked when payments are late. Third, RIAA contends that a late fee is inappropriate because the lateness of payments results in large part from uncertainty about the appropriate division of royalties among joint copyright owners. RIAA suggests that this problem is the fault of the copyright owners themselves. Fourth, RIAA relatedly submits that the Board failed to adequately address its argument about the problems presented by co-copyright owners. We will consider each of those objections in turn.

A

RIAA argues that the late fee must be tethered to late fees that can be found in the existing market for voluntary licenses. By RIAA's account, there are no late fees in the voluntary market for the copyrights that § 115 covers. As a result, RIAA contends the Board should not be able to impose a late fee in this compulsory license setting.

The Copyright Act provides that the Board "may consider rates and terms under voluntary license agreements" in addition to the mandatory "objectives set forth in section 801(b)(1)" when setting the terms of the § 115 license.  17 U.S.C. § 115(c)(3)(D).  As this Court explained in *Recording Industry Association of America v. Librarian of Congress*, the Librarian has interpreted a Seventh Circuit "precedent to mean that marketplace analogies, along with other evidence, must be considered," which we held to be "a reasonable interpretation of the precedent."  176 F.3d 528, 534 (D.C. Cir. 1999).  At most, then, the Board must "consider[]" the existing market for voluntary licenses.

The Board did so here, explaining that a late fee would correspond with the practices in other similar markets – in particular, the closely related webcasting and satellite digital radio industries.  74 Fed. Reg. at 4527; *see* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4099 (Jan. 24, 2008); Digital Performance Right in Sound Recordings and Ephemeral Recordings, 72 Fed. Reg. 24,084, 24,107 (May 1, 2007).  The copyright owners presented evidence during the proceedings – considered by the Board – that the major record labels have late fee clauses in their royalty contracts with digital music services like iTunes.  J.A. 523-24.  And RIAA acknowledged that at least a handful of royalty agreements provide copyright owners with late-fee protection.  J.A. 618-19.

The Board also considered other relevant market metrics.  Copyright owners presented evidence indicating that payments were frequently made to copyright owners after they were due.  Some of the evidence in the record suggested that from January 2000 to September 2007, over 41,000

payments totaling more than $2.1 billion arrived after their due dates. J.A. 433. Though RIAA disputed the magnitude of the problem, none of the parties to the proceeding claimed the problem was non-existent. 74 Fed. Reg. at 4527 n.50.

And although the Board *considers* market conditions when setting terms and rates, they are not required to choose a late fee that exactly matches a market rate. Such a rule would, in effect, nullify the congressional authorization for late fees.

In short, the Board appropriately took market evidence into account when imposing the late fee.

B

The Copyright Act authorizes copyright owners to terminate § 115 licenses for nonpayment. 17 U.S.C. § 115(c)(6). RIAA argues that the presence of that provision renders a late fee unnecessary.

But the Copyright Act itself refutes this either-or argument. The statute both grants the copyright owners a termination right *and* authorizes the Board to impose a late fee. Moreover, by the terms of the statute, that late fee "in no way shall . . . prevent the copyright holder from asserting other rights or remedies provided" by the Copyright Act. *Id.* § 803(c)(7). The congressional scheme clearly contemplates both a termination right and a late fee.

The congressional framework makes good sense because the incentive to make timely payments in order to avoid § 115 license termination is rather weak, if any such incentive exists at all. Under the terms of the statute, a copyright owner must

give a licensee 30 days to cure any nonpayment before terminating the license. *Id.* § 115(c)(6). As the Government persuasively points out, the termination provision "cannot possibly serve as an incentive to make timely royalty payments, because the licensee can avoid any consequences of withholding payment by simply waiting until the copyright owner initiates termination and then making the payment before the 30-day notice period has expired." Government's Br. at 40.

In short, a copyright owner's ability to terminate a § 115 license in no ways bars the imposition of a late fee.

C

RIAA also asserts that it was unreasonable for the Board to impose a late fee benefiting copyright owners because, it says, copyright owners are often the source of the problems that cause late payment. By RIAA's account, when more than one party owns a copyright in a work, those joint copyright owners often fail to decide who is entitled to what share of the royalties. RIAA contends that uncertainty about what amount is owed to individual copyright owners when a copyright is jointly held is often the underlying reason that payments are late.

That argument is unpersuasive. Even if it were true that divided interests in a copyright made it difficult to make timely payments to each copyright owner, that fact would in no way counsel against the imposition of a late fee. The regulations governing the operation of the § 115 license contemplate that scenario and set forth a solution. A licensee can satisfy its obligation to pay a royalty by paying any *one* copyright owner – even when many individuals have a stake

in a copyright. *See* 37 C.F.R. § 201.18(a)(5) ("For the purposes of this section, the term copyright owner, in the case of any work having more than one copyright owner, means any one of the co-owners.") (emphasis omitted); *id.* § 201.18(a)(6) ("In the case where the work has more than one copyright owner, the service of the Notice on any one of the co-owners . . . shall be sufficient with respect to all co-owners."); *id.* § 201.19(a)(5) ("In the case where the work has more than one copyright owner, the service of the Statement of Account on one co-owner . . . shall be sufficient with respect to all co-owners.").

We therefore reject this argument as a basis for upsetting the Board's imposition of a late fee.

## D

RIAA relatedly argues that the Board failed to adequately *consider* RIAA's assertion that a late fee was unreasonable because of the uncertainties caused by split payments. But both the Board's final determination and the order denying RIAA's motion for a rehearing specifically addressed that argument. And as we have already discussed, the problem presented by jointly held copyrights is really no problem at all; a licensee can meet its § 115 licensing obligation by paying any one owner of a jointly owned copyright.

In sum, RIAA has failed to raise any argument that would justify our overturning the Board's 1.5 percent per month late fee.

## III

We next consider RIAA's challenge to the royalty rates for cell phone ringtones.[3]

As part of the § 115 licensing proceedings, the Board established what is known as a penny-rate royalty structure for ringtones. Under that rate, copyright owners receive 24 cents for every ringtone sold using their copyrighted work.

In the proceeding before the Board, RIAA argued for a percentage-of-revenue royalty structure under which copyright owners would receive 15 percent of the wholesale revenue derived from the sale of a ringtone. As a less preferred alternative, RIAA sought a penny-rate royalty structure in which copyright owners would receive 18 cents per ringtone sold.[4]

---

[3] The Government and intervenors argue that waiver, estoppel, or a lack of standing bars RIAA from challenging the Board's imposition of a penny-rate royalty structure for ringtones. Though varying in flavor, these arguments all follow the same essential form: Because RIAA endorsed a penny-rate structure as a less preferred alternative to a percentage-of-revenue structure before the Board, it waived its right to challenge (or is estopped from challenging, or lacks standing to challenge) the imposition of the penny-rate royalty in this Court. Not so. This Court's case law indicates that a party can appeal an agency's adoption of a rate proposed by that party when it was proffered as a second-best option. *Cf. Southern Natural Gas Co. v. FERC*, 877 F.2d 1066, 1070-71 (D.C. Cir. 1989).

[4] Other parties to the proceeding offered competing rates. For example, the copyright owners endorsed a rate structure in which they would receive the greater of (1) 15 percent of all revenue associated with the ringtone, (2) 33.3 percent of the cost that would have been paid for the mechanical rights to the equivalent musical

Applying the § 801(b)(1) criteria, the Board settled on a penny-rate royalty structure of 24 cents per ringtone sold. With respect to the first statutory criterion it had to consider – maximizing the availability of creative work – the Board concluded that a "nominal rate[] for ringtones" supports that objective. Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 4510, 4524 (Jan. 26, 2009). As to the second criterion – affording the copyright owner a fair return – the Board found that the new rates did not deprive copyright owners of a fair return on their creative works. *Id*. The Board also found that the penny rate met the third statutory criterion – respecting the relative roles of the copyright owner and user. *Id.* at 4525. And under the fourth criterion – minimizing disruptive impact on the industry – the Board found that the rate structure it chose was reasonable and already in place in many parts of the market, minimizing any disruptive impact. *Id*.

On two separate grounds, RIAA now challenges the structure of the ringtone royalty rate imposed by the Board – specifically, the fact that it is a penny rate rather than a percentage-of-revenue rate. First, using an argument similar to the one it lodged against the 1.5 percent late fee, RIAA alleges that the penny-rate royalty structure inappropriately departs from market analogies for voluntary licenses. Second, RIAA contends that a penny rate is unreasonable in light of falling ringtone prices.

---

composition and sound recordings, and (3) 15 cents per ringtone, subject to periodic inflation adjustments. Mechanical and Digital Phonorecord Delivery Rate Determination Proceeding, 74 Fed. Reg. 4510, 4515 (Jan. 26, 2009).

16

A

As previously discussed, although existing market rates for voluntary licenses do not bind the Board when making its determinations, the Board considered those rates when selecting the penny-rate royalty structure.

The Board expressly recognized that marketplace ringtone contracts typically provide for royalty payments at the greater of (1) a penny rate ranging from 10 to 25 cents; (2) a percentage of retail revenue ranging from 10 to 15 percent; and (3) a percentage of gross revenue ranging from 9 to 20 percent.  74 Fed. Reg. at 4518.

After weighing the costs and benefits of the parties' proposals and taking into account relevant market practices, the Board concluded that a penny rate was superior to a percentage-of-revenue rate for several reasons.

First, the Board determined that a penny rate was more in line with reimbursing copyright owners for the use of their works.  Under the Board's determination, every copyright owner will receive 24 cents every time a ringtone using their work is sold.  By contrast, under a percentage-of-revenue system, the royalty paid to copyright owners would vary based on factors in addition to the number of ringtones sold, such as the price charged to the end consumer.  This Court has validated the Board's preference for a royalty system based on the number of copyrighted works sold – like the penny rate – as being more directly tied to the nature of the right being licensed than a percentage-of-revenue rate.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 760-61 (D.C. Cir. 2009).

Second, when looking to market analogies, the Board determined that many of the concerns driving the adoption of a percentage-of-revenue royalty structure in other instances were absent here. For example, the Board had previously concluded that a percentage-of-revenue royalty structure made sense in the satellite digital radio context because it would be difficult to measure how much a given work was actually used. *See* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4086 (Jan. 24, 2008). In the case of ringtones, "measuring the quantity of reproductions presents no such problems." 74 Fed. Reg. at 4516. In a market based on the sale of individual copyrighted works (like the ringtone market) as opposed to a market where copyrighted works are bundled and sold as a service to consumers (like satellite radio) figuring out how many times a copyrighted work is used (i.e., sold) is much easier.

Third, the Board found that the simplicity of using a penny-rate royalty structure supported its adoption: "No proxies need be formulated to establish the number of such reproductions," which are "readily calculable as the number of units in transactions between the parties." 74 Fed. Reg. at 4516. That simplicity contrasts sharply with the "salient difficulties" presented by RIAA's proposed percentage-of-revenue royalty structure. *Id*. As the Board recognized, not least among these difficulties were definitional problems such as disagreements about what constituted "revenues." *Id.*

Tying all of those strands together, the Board ultimately concluded "that a single penny-rate structure is best applied to ringtones as well as physical phonorecords and digital permanent downloads" because of "the efficiency of administration gained from a single structure when spread

over the much larger number of musical works reproduced" under the § 115 licensing regime. 74 Fed. Reg. at 4517 n.21. In the Board's view, the penny rate provided "the most efficient mechanism for capturing the value of the reproduction and distribution rights at issue." 74 Fed. Reg. at 4515.

We find nothing unreasonable about the Board's preference for a penny-rate royalty structure.

B

RIAA also argues that plummeting ringtone prices render the penny rate inherently unreasonable. The Board considered and rejected this argument, stating: "RIAA's shrill contention that a penny-rate structure 'would be disruptive as consumer prices continue to decline' and should, therefore, be replaced by a percentage rate system in order to satisfy 801(b) policy considerations . . . is not supported by the record of evidence in this proceeding. . . . RIAA [does not] offer any persuasive evidence that would in any way quantify any claimed adverse impact on projected future revenues stemming from the continued application of a penny-rate structure . . . ." 74 Fed. Reg. at 4516.

Although the Board concluded that falling ringtone prices were not relevant to the choice of a penny-rate royalty as opposed to a percentage-of-revenue royalty, it did find information about declining prices useful in structuring the terms of the penny rate it chose. *See* 74 Fed. Reg. at 4523. For example, the Board referenced concerns about reduced revenues when rejecting the copyright owners' request that selected rates be adjusted annually for inflation. *Id.*

The Board examined the relevant data and determined that there was no meaningful link between the selection of a penny-rate royalty structure for ringtones and future ringtone revenues. RIAA has failed to present any basis for us to overturn that conclusion.

* * *

We affirm the Copyright Royalty Board's determination.

*So ordered.*