# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 8, 2018　　　Decided September 18, 2018

No. 16-1159

SOUNDEXCHANGE, INC.,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
APPELLEES

GEORGE JOHNSON, ET AL.,
INTERVENORS

---

Consolidated with 16-1162

---

On Appeal from a Final Determination of the Copyright
Royalty Board

---

*Benjamin J. Horwich* argued the cause for appellant SoundExchange, Inc. With him on the briefs were *Glenn D. Pomerantz*, *Kelly M. Klaus*, and *Rose Leda Ehler*.

*George D. Johnson*, pro se, argued the cause and filed briefs for appellant.

*Sonia M. Carson*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Mark R. Freeman* and *Jennifer L. Utrecht*, Attorneys.

*Scott H. Angstreich* argued the cause for intervenors National Association of Broadcasters, et al. With him on the joint brief were *Michael K. Kellogg*, *John Thorne*, *Leslie V. Pope*, *R. Bruce Rich*, *Todd D. Larson*, and *Gregory S. Silbert*.

*Catherine R. Gellis* was on the brief for intervenor College Broadcasters, Inc. in support of appellees.

Before: ROGERS, GRIFFITH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: This case concerns the rates paid by webcasters to license copyrights in digital sound recordings. Webcasters stream digital sound recordings to listeners over the Internet. A so-called "noninteractive" webcasting service chooses the recordings to play for listeners, whereas an "interactive" service allows an individual listener to select music on demand.

Congress established a statutory copyright license for noninteractive webcasters in the Copyright Act. The statutory license enables noninteractive webcasters to transmit recordings by paying a standard royalty rate rather than negotiating licensing agreements with copyright holders. Every five years, the Copyright Royalty Board sets the standard rates noninteractive webcasters must pay to play recordings over the Internet under the statutory license.

This appeal raises challenges to the Board's most recent rate determination on a number of grounds. We sustain the Board's determination in all respects.

I.

A.

Congress set out the statutory scheme for the protection and regulation of copyrights in the Copyright Act, 17 U.S.C. § 101 *et seq.* While the owner of a copyright in a musical work has long enjoyed an exclusive right to perform it to the public, *id.* § 106(4), the owner of a copyright in a particular sound recording of the work—e.g., a specific performance by a given artist—traditionally lacked an exclusive performance right. In 1995, Congress amended the Act to grant owners of copyrights in sound recordings the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission." Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, § 2, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)).

Congress, though, subjected that right to a system of statutory licenses. The statutory licenses enable digital audio services to perform copyrighted sound recordings by paying predetermined royalty fees, without separately securing a copyright holder's permission. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 114 (D.C. Cir. 2015) (citing Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998)).

The authority to set rates and terms for the statutory licenses resides with the Copyright Royalty Board, a group of three Copyright Royalty Judges appointed by the Librarian of Congress. 17 U.S.C. § 801. When the Board undertakes the

process of setting a statutory license, it first allows interested parties to negotiate private license rates and terms. *See id.* § 803(b)(3); 37 C.F.R. § 351.2. For parties that do not reach a voluntary agreement, the Board holds adversarial proceedings to determine the standard rates and terms of the statutory license. *See* 37 C.F.R. § 351.3 *et seq.*

At the conclusion of its proceedings, the Board issues a final determination establishing the rates and terms and explaining its decisionmaking. *Id.* § 803(c)(3). The Board's determination is reviewed by the Register of Copyrights for legal error, *id.* § 802(f)(1)(D), and published by the Librarian of Congress in the Federal Register, *id.* § 803(c)(6). The determination is subject to review in this court. *Id.* § 803(d)(1).

B.

The Board conducts a separate ratesetting proceeding for each statutory license it administers, and each license pertains to a distinct category of transmission service. *See* 17 U.S.C. § 801(b)(1). One license covers webcasters. Every five years, the Board holds proceedings to determine the "reasonable rates and terms of royalty payments" governing the webcaster statutory license for the ensuing five-year period. *Id.* § 114(f)(2)(A).

The statutory license for webcasters applies solely to noninteractive services, i.e., services that select the songs they play for listeners. *Id.* One example of a noninteractive webcaster is a Pandora music channel. By contrast, an interactive webcaster—i.e., one that allows each listener to pick particular songs to hear on demand—must negotiate its copyright licenses on the open market. *Id.* § 114(d)(2)(A)(i). An example of an interactive service is Spotify's basic service.

The Board must "establish rates and terms" for the webcaster statutory license "that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 114(f)(2)(B). The Act further directs the Board to base its "decision on economic, competitive and programming information presented by the parties." *Id.* The Board may also consider the rates and terms negotiated for comparable services and "comparable circumstances under voluntary license agreements." *Id.* Additionally, the rates and terms set by the Board "shall distinguish among the different types of" webcaster services, *id.* § 114(f)(2)(A), meaning that distinct segments of webcasters—such as noncommercial services—receive their own rates and terms.

In carrying out those statutory directives, the Board has developed a benchmark-based process. *See* Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings (*Web III Remand*), 79 Fed. Reg. 23,102, 23,110 (Apr. 25, 2014). First, interested parties submit information they think should guide the Board's ratesetting. That information includes "voluntary license agreements" negotiated for comparable services, 17 U.S.C. § 114(f)(2)(B), which the parties believe the Board can use as benchmark rates. The Board assesses whether the voluntary agreements adequately reflect rates "that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* If not, the Board determines whether it can adjust the agreements to render them useful benchmarks. *See Web III Remand*, 79 Fed. Reg. at 23,115.

The Board uses the accepted benchmarks to establish a "zone of reasonableness" and fixes the statutory license rate within that zone. *See id.* at 23,110. The Board then repeats

that process for each segment of webcaster services for which it sets distinct rates.

## C.

The Board's previous ratesetting determinations for the webcaster statutory license have been reviewed (and largely upheld) by this court. *See Intercollegiate Broad. Sys., Inc.*, 796 F.3d 111 (D.C. Cir. 2015); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748 (D.C. Cir. 2009); *Beethoven.com LLC v. Librarian of Cong.*, 394 F.3d 939 (D.C. Cir. 2005). This case concerns the Board's fourth ratesetting proceeding for webcasters, which set the rates and terms of the statutory license for 2016 to 2020.

The proceeding included a six-week hearing, in which the Board admitted some 660 exhibits consisting of more than 12,000 pages of documents and heard the oral testimony of 47 witnesses. Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (*Web IV*), 81 Fed. Reg. 26,316, 26,317 (May 2, 2016). Fifteen parties participated, *id.* at 26,316–17, including the two parties who bring this appeal: (i) SoundExchange, Inc., a collective management organization representing holders of copyrights in sound recordings, which receives royalty payments under the webcaster statutory license and distributes the payments to copyright holders; and (ii) George Johnson (dba GEO Music), an independent singer/songwriter.

Several parties submitted voluntarily negotiated agreements for the Board to consult as benchmarks. The Board adopted several of those proposed benchmarks, using them to set distinct rates for (i) ad-based commercial noninteractive webcaster services and (ii) subscription-based commercial

noninteractive webcaster services. *Id.* at 26,404. Ad-based services do not charge listeners a fee and earn revenue by broadcasting advertisements between songs. Subscription-based services charge listeners a fee and play music streams uninterrupted by advertisements.

1. With respect to the rates for ad-based services, two webcaster companies that offer such services—Pandora Media and iHeartMedia—each proposed a benchmark agreement derived from the ad-based, noninteractive services market. Pandora based its proposal on a royalty agreement it had negotiated with Merlin, an agency representing thousands of independent record companies. 81 Fed. Reg. at 26,355–56. iHeart based its proposal on an agreement it had negotiated with Warner, a major record label. 81 Fed. Reg. at 26,375.

Both Pandora's and iHeart's proposed ad-based benchmark agreements contained a feature known as "steering." "Steering" involves technology enabling a webcaster to alter the natural frequency of performances under its algorithm. If a webcaster chooses to "steer" in favor of a given record label, it will play songs from artists on the label more often than its algorithm would otherwise yield. Steering benefits a record label because broader exposure can help attract additional listeners to the label's artists and generate revenue for the label from traditional sources like music sales and merchandise.

Pandora and other webcasters began incorporating steering capability into their services fairly recently. In the Pandora-Merlin and iHeart-Warner agreements, the parties agreed that if the webcaster steered in favor of the record company—increasing the number of plays for the record company's artists by a certain percentage—the webcaster

could reduce the per-performance license rate it paid to the record company. *See* 81 Fed. Reg. at 26,356, 26,375.

SoundExchange opposed the use of the Pandora and iHeart agreements as benchmarks. The Board rejected SoundExchange's concerns and accepted rates from the Pandora and iHeart agreements as probative of the rates noninteractive services would pay in the ad-based webcaster market. The Board thus used those benchmarks to establish its zone of reasonableness. The Board then set the statutory royalty rate for ad-based commercial noninteractive webcasters within that range at $0.0017 per song performance for 2016, to be adjusted in later years to account for inflation. 81 Fed. Reg. at 26,405.

2. With respect to the rates for subscription-based services, the Board again considered benchmarks that would be probative of rates negotiated in that segment of the webcaster market. Pandora proposed as a benchmark the steered rates negotiated in its agreement with Merlin for its subscription-based service (which it offers in addition to its ad-based service). *See* 81 Fed. Reg. at 26,356. The Board, as noted, rejected SoundExchange's arguments against relying on the Pandora-Merlin agreement and accepted the agreement's steered rates as a benchmark for subscription-based services. 81 Fed. Reg. at 26,374–75.

SoundExchange proposed its own benchmark agreement for the Board to consider. SoundExchange's proposal, though, involved agreements negotiated between *interactive* webcaster services and copyright owners. As discussed, interactive webcasters—which allow on-demand streaming—cannot rely on the statutory license and must negotiate their licenses on the open market. 17 U.S.C. § 114(d)(2)(A)(i). To derive its proposed benchmark, SoundExchange adjusted the average

royalty rate negotiated by interactive webcaster services to account for differences between the interactive and noninteractive markets.

The Board concluded that SoundExchange's proposed rate would serve as a useful benchmark for subscription webcaster services. 81 Fed. Reg. at 26,344. The Board, though, determined that SoundExchange's proposed rates needed to be further adjusted because the interactive services market is not "effectively competitive." 81 Fed. Reg. at 26,344, 26,353. In the Board's view, the statute calls for setting rates based on a "sufficiently competitive market, *i.e.*, an 'effectively competitive' market." 81 Fed. Reg. at 26,332.

Because the Board believed that "the interactive services market is *not* effectively competitive," the Board concluded that SoundExchange's proposed benchmark from that market needed to be adapted "to render it . . . usable as an 'effectively competitive' rate in . . . the noninteractive subscription market." 81 Fed. Reg. at 26,344. The Board did so by discounting SoundExchange's proposed benchmark based on a "steering adjustment" grounded in the steered rates in the Pandora-Merlin agreement, which the Board believed was a useful proxy for the effects of price competition. 81 Fed. Reg. at 26,343–44, 26,404–05.

The Board used the SoundExchange benchmark (with the steering adjustment) and the Pandora benchmark (which already accounted for steering) to set the zone of reasonable rates for the subscription-based webcasters. 81 Fed. Reg. at 26,405. Selecting a rate within that range, the Board set the statutory royalty rate for subscription-based commercial noninteractive webcasters at $0.0022 per song performance for 2016, to be adjusted in ensuing years to account for inflation. *Id.*

3. SoundExchange and George Johnson moved for rehearing of the Board's determination under 17 U.S.C. § 803(c)(2). In March 2016, the Board denied the motions for rehearing, made certain clarifications, and issued its final determination. In May 2016, the Librarian of Congress published the final determination in the Federal Register. *Web IV*, 81 Fed. Reg. 26,316. SoundExchange and George Johnson now appeal the Board's determination to this court.

## II.

SoundExchange challenges four aspects of the Copyright Royalty Board's webcaster license determination: (i) the adoption of the Pandora and iHeart benchmarks over SoundExchange's objections; (ii) the adjustment downward of SoundExchange's proposed benchmark rate for subscription-based services in an effort to capture "effective competition"; (iii) the decision to set separate license rates for ad-based and subscription-based commercial webcasters; and (iv) the revision of the requirements for auditors to qualify to perform verification of royalty payments.

We review the Board's rate determinations under § 706 of the Administrative Procedure Act. 17 U.S.C. § 803(d)(3). The APA requires us to "affirm the [Board's] decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dodge v. Comptroller of Currency*, 744 F.3d 148, 155 (D.C. Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). Our review of "administratively determined rates is particularly deferential because of their highly technical nature." *Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 127. Applying that standard, we sustain the Board's determination against SoundExchange's challenges.

11

A.

We first address SoundExchange's arguments that the Board's acceptance of the Pandora and iHeart benchmark agreements was arbitrary and capricious.

1.

SoundExchange contends that the Board arbitrarily failed to account for the impact of the statutory license on the rates negotiated in the Pandora and iHeart benchmark agreements. It is undisputed that, in setting rates for the statutory license, the Board must aim to approximate rates that would have been negotiated "if the webcasting statutory license did not exist." *Id.* at 131. The hypothetical marketplace, that is, must be "free of the influence of compulsory, statutory licenses." *Web IV*, 81 Fed. Reg. at 26,316.

In approximating the rates that would be negotiated in the hypothetical marketplace, though, the Board relies on actual, real-world agreements. And parties in the actual marketplace, SoundExchange emphasizes, generally negotiate with the knowledge that they can simply fall back on the statutory rate if they fail to strike a bargain. The parties refer to the effect of the statutory license on market negotiations as the "shadow" of the statutory license.

In the proceedings before the Board, SoundExchange argued against the proposed Pandora and iHeart benchmarks on the ground that they were affected by the shadow of the statutory license. The Board disagreed, concluding that any statutory shadow "did not meaningfully affect" the benchmark rates on which it opted to rely. 81 Fed. Reg. at 26,329. Rather, the Board reasoned, its accepted benchmarks were "sufficiently representative" of the "particular segments of the statutory

market" they were chosen to reflect. *Id*. at 26,330 (emphasis omitted).

The Board further explained that there was no "'shadow' problem" for the iHeart or Pandora benchmarks because the pertinent rates in those agreements were "*below* the otherwise applicable statutory rates." *Id*. at 26,331. And when licensors "voluntarily agreed to rates below the applicable statutory rates . . . rather than defaulting to the higher statutory rate," the Board reasoned, the rates could not have been affected by the shadow of the statutory license. *Id*.; *see id*. at 26,383.

In its determination, the Board compared the per-performance royalty rate in the Pandora and iHeart agreements to the per-performance rate in the statutory license. *See id*. at 26,331. SoundExchange now contends that the Board's focus on per-performance rates was flawed in that the Board instead should have compared the *total compensation* the record companies expected to receive under the benchmark agreements to the *total compensation* anticipated under the statutory license.

SoundExchange faces an uphill battle in challenging the Board's selection of its benchmarks. We have repeatedly recognized that it is "within the discretion of the [Board] to assess evidence of an agreement's comparability and to decide whether to look to its rates and terms for guidance." *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 759. The Board's "broad discretion" encompasses its selection or rejection of benchmarks, as well as its adjustment of benchmarks to "render them useful." *Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1009 (D.C. Cir. 2014). The Board's discretion thus includes determining how to respond to the potential effect of the statutory shadow on a proposed benchmark. *See* Scope of

the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. 58,300, 58,307 (Sept. 28, 2015).

Here, the Board decided to use per-performance rates as the relevant point of comparison in determining whether a benchmark agreement had been affected by the statutory license. SoundExchange cites no Board precedent or other authority supporting its contention that the Board was instead obligated to use total compensation as the comparator. Nor did SoundExchange propose to the Board a feasible way to measure the "total compensation" supplied by a negotiated bundle of rates and terms. We thus conclude that the Board reasonably exercised its discretion to select per-performance rates as the relevant metric of comparison.

Relatedly, SoundExchange faults the Board for failing to assign value to nonmonetary terms in the Pandora and iHeart agreements, which precluded the Board from adjusting the benchmark rates accordingly. For instance, the copyright holders negotiated promises of free advertising slots and minimum shares of certain revenues. According to SoundExchange, the Board would have better approximated the benchmark rates under the agreements if it had accounted for those sorts of terms.

The Board, though, examined those terms at length in its determination and rejected the notion that they supported raising the benchmark rates. *See* 81 Fed. Reg. at 26,359–63, 26,369–70, 26,384–88. In particular, because the parties neglected to put evidence in the record about how to value the other terms in the agreements, the Board had no basis on which to account for their value in adjusting the benchmarks. *See, e.g.*, *id.* at 26,369, 26,387. The Board reasoned that it "cannot arbitrarily adjust or ignore [an] otherwise proper and reasonable benchmark." *Id*. at 26,387. In its arguments before

us, SoundExchange again fails to point to any evidence in the record on which the Board could have relied in adjusting the benchmark per-performance rates. In that context, we conclude that the Board reasonably declined to substitute its own speculation for evidence that the parties could have made part of the "written record." 17 U.S.C. § 803(c)(3).

More generally, the Board gave extensive attention to arguments about the statutory shadow in its determination, and it concluded that the Pandora and iHeart benchmarks were unaffected. 81 Fed. Reg. at 26,329–31, 26,383. That was a permissible and adequately explained exercise of the Board's discretion.

2.

SoundExchange next contends that the Board arbitrarily ignored how the statutory license generally prevents parties from negotiating rates above the statutory royalty. An expert witness for SoundExchange testified that the existence of the statutory license has the effect of crowding out agreements that would otherwise contain higher negotiated rates. *See id.* at 26,330. In SoundExchange's view, that dynamic skews the evidence before the Board, in that the field of potential benchmark agreements negotiated in the actual market will necessarily contain a per-performance royalty below the statutory rate.

Addressing the expert's testimony, the Board concluded that, although his observation was "rational," it was "too untethered from the facts to be predictive or useful in adjusting for the supposed shadow of the existing statutory rate." *Id.* at 26,330. The Board thus chose to adhere to the "sufficiently representative benchmarks" it had identified, without attempting to account for the hypothetical, "missing"

agreements that might have rendered the expert's theory a more useful one in practice. *Id*.

As the Board noted elsewhere in its determination, the Board "cannot arbitrarily adjust or ignore [an] otherwise proper and reasonable benchmark." *Id*. at 26,387. The Board was not obligated to adjust its benchmarks based on what it considered to be the expert's "factual[ly] indetermina[te]" theory, *id*. at 26,330, in the absence of additional "written record" evidence supporting the necessity for, and magnitude of, any associated adjustments. 17 U.S.C. § 803(c)(3); *see Settling Devotional Claimants v. Copyright Royalty Bd.*, 797 F.3d 1106, 1121 (D.C. Cir. 2015). The Board's decision to rely on the concrete evidence before it—instead of a theory the Board reasonably thought could not be translated into practice—was permissible.

3.

SoundExchange also challenges the Board's decision to use steered rates as benchmarks. SoundExchange observes that the discounted steered rates came with the promise of increased performance of the record company's recordings; and that promise, SoundExchange notes, by nature could not be extended to the entire marketplace (because it would be impossible to increase the share of performances for all copyright holders). As a result, SoundExchange asserts, it is arbitrary to incorporate steered rates into the across-the-board statutory license. *See* 81 Fed. Reg. at 26,363–65.

We disagree. The Board permissibly determined that, although SoundExchange's argument about steered rates is "mathematically correct" in a "static sense," it is not "*economically* correct" in a "dynamic sense." *Id.* at 26,366. A webcaster of course cannot *actually* engage in steering for every copyright holder. But the Board determined that the

mere *threat* of steering would introduce price competition into the market. For instance, a webcaster's threat to steer in favor of a copyright holder's competitors can induce the copyright holder to agree to lower per-performance rates. That competitive effect occurs, the Board reasoned, even if the threat of steering is never realized. *Id.* at 26,366–67. We see no basis to set aside the Board's determination in that regard as arbitrary.

The Board further concluded that "[s]teering is synonymous with price competition in this market" and adopted the steered rates as benchmarks. *Id.* at 26,366. We afford the Board "broad discretion" when it "mak[es] predictive judgments" about the music marketplace. *Music Choice*, 774 F.3d at 1015. The Board acted within this discretion in concluding that the likely effect of steering in the music industry would be to promote price competition.

### B.

We now turn to the Board's decision to adjust SoundExchange's proposed benchmark rates to offset a perceived lack of effective competitiveness in the interactive-services market. Whereas noninteractive webcasters can make use of the statutory license, interactive services must negotiate licensing agreements with copyright holders in the market. *See* 17 U.S.C. §§ 114(d)(2)(A)(i), (f)(2)(A). The benchmark rate for subscription services proposed by SoundExchange came from the interactive-services market, *see* 81 Fed. Reg. at 26,335, not the noninteractive market for which the Board sought to set rates and terms.

As a threshold step before incorporating SoundExchange's proposed benchmark rates into the ratesetting for the noninteractive services market, the Board examined the

"[l]egal [i]ssue" of whether it was obligated "to set a rate that reflects an '*effectively competitive*' market populated by willing buyers and willing sellers." *Id.* at 26,331. The Board concluded that the statute required setting "a rate that reflects a market that is effectively competitive." *Id.* at 26,332. But the Board went on to explain that, even if the statute were "ambiguous" in that regard, the Board "can and should determine whether the proffered rates reflect a sufficiently competitive market, *i.e.*, an 'effectively competitive' market," and that such an approach is "certainly a permissible, reasonable, and rational application of [17 U.S.C.] § 114 for a number of reasons." *Id.* at 26,332.

The Board then applied its "effective competition" interpretation to SoundExchange's proposed benchmark rates. The Board found that the interactive services market giving rise to SoundExchange's benchmark was inadequately competitive due to the possession of oligopoly power by certain copyright holders, and that an adjustment was needed to "eliminate the complementary oligopoly effect." *Id.* at 26,353; *see id.* at 26,343–44. The Board concluded that the discount for steered rates in the Pandora-Merlin agreement served as a suitable proxy for estimating the effects of price competition, *id.* at 26,344; and it thus applied a corresponding discount factor to SoundExchange's proposed rates, *id.* at 26,404–05.

SoundExchange challenges the Board's adoption of an effective-competition standard when determining the "rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). SoundExchange's objection is one of design, not of application. That is, SoundExchange's challenge is confined to the Board's threshold understanding that the statute incorporates (or can incorporate) an effective-competition requirement. SoundExchange does not go on to argue that, if

the statute can accommodate the Board's interpretation, then the specific way in which the Board implemented that understanding—by discerning that the interactive-services market lacked effective competition and by applying a steered-rate adjustment as a fix—was nonetheless flawed.

We first consider whether the Board's interpretation of the statute is subject to review under the familiar *Chevron* framework. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Answering the question yes, we then review—and sustain—the Board's interpretation under *Chevron*.

1.

We have previously applied the *Chevron* framework when reviewing the Board's interpretation of the same statutory provision at issue here: the requirement to determine royalty rates that "most clearly represent the rates . . . that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B); *see Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 756–57. Our precedent thus would seem to call for applying *Chevron* in this case as well.

The path is not so straightforward, though, because the Board does not invoke—or even cite—*Chevron* in its briefing to us. To the contrary, whereas SoundExchange treats (and challenges) the Board's adoption of an effective-competition standard as a matter of statutory interpretation, the Board's briefing does not engage the issue on the same terms. The Board does not defend its adjustment of SoundExchange's proposed benchmark rates as a reasonable understanding that the statute calls for identifying rates that would prevail in a hypothetical, effectively competitive market. The Board instead treats the adjustment solely as a case-specific effort to

adapt the conditions in the interactive market to the actual conditions in the noninteractive market. That approach is difficult to square with the Board's treatment of the issue in its order under review. Indeed, the Board's determination contains a separate section at the outset entitled: "The Legal Issue of Whether Effective Competition is a Required Element of the Statutory Rate." 81 Fed. Reg. 26,331–34.

Does the Board's failure to reference the *Chevron* framework in its briefing in our court mean that we should disregard *Chevron* when reviewing the Board's challenged interpretation? We recently held that an agency can forfeit its ability to obtain deferential review under *Chevron* by failing to invoke *Chevron* in its briefing. *Neustar, Inc. v. FCC*, 857 F.3d 886, 893–94 (D.C. Cir. 2017). Before *Neustar*, we had held that a *party challenging* an agency's interpretation of a statute could forfeit an *objection* to *Chevron* deference. *See Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015). But we had not addressed the converse question of whether an *agency defending* its decision could forfeit an *entitlement* to *Chevron* deference. In *Neustar*, the "FCC's brief nominally reference[d] *Chevron*'s deferential standard in its standard of review but did not invoke this standard with respect to" the challenged statutory interpretation at issue. 857 F.3d at 893–94. We held that the agency had thereby "forfeited any claims to *Chevron* deference." *Id.* at 894.

If that were all we said in *Neustar*, the Board seemingly would have forfeited its ability to benefit from *Chevron* deference here as well. But in *Neustar*, we grounded our finding of forfeiture on an additional observation beyond the agency's failure to invoke *Chevron* in its briefing to us: "Similarly," we explained, "review of the relevant agency orders shows no invocation of *Chevron* deference for this matter." *Id.*

By that observation, we did not indicate a "magic words" requirement.  We do not anticipate agencies would reference the *Chevron* framework by name in the course of their own decisionmaking:  *Chevron* is a standard of *judicial* review, not of *agency* action.  *See Braintree Elec. Light Dep't v. FERC*, 667 F.3d 1284, 1288 (D.C. Cir. 2012) ("[T]he *Chevron* two-step is a dance for the court, not the Commission.").  We instead indicated that, if an agency manifests its engagement in the kind of interpretive exercise to which review under *Chevron* generally applies—i.e., interpreting a statute it is charged with administering in a manner (and through a process) evincing an exercise of its lawmaking authority—we can apply *Chevron* deference to the agency's interpretation even if there is no invocation of *Chevron* in the briefing in our court.  After all, "it is the expertise of the agency, not its lawyers," that ultimately matters.  *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 n.3 (D.C. Cir. 2006).

Here, the Board's determination amply manifests the requisite engagement in an exercise of interpretive authority.  Indeed, the Board explicitly considered "the plain meaning of the statute, the clear statutory purpose, applicable prior decisions, and the relevant legislative history."  81 Fed. Reg. at 26,332.  The Board in fact essentially incanted the language of the *Chevron* framework (even though, as we have said, an agency need not parrot the language of *Chevron* in order to receive deference).  While the Board first read the statute to compel it to determine rates that would prevail in a market characterized by effective competition, the Board did not stop there.  The Board went on to explain that, even if the statute were "ambiguous" on that score, it "can and should determine whether the proffered rates reflect a sufficiently competitive market, *i.e.*, an 'effectively competitive' market."  *Id.* at 26,332.    And  while  that  alone  confirms  the  agency's

involvement in an interpretive enterprise implicating *Chevron*, the Board even echoed the language of *Chevron* review in explaining that its interpretation "is certainly a permissible, reasonable, and rational application of § 114." *Id.*; *see, e.g.*, *Jacoby v. NLRB*, 325 F.3d 301, 310 (D.C. Cir. 2003) ("We are . . . required by *Chevron* to defer to [the agency's] reasonable and permissible interpretation of the Act.").

In sum, consistent with our previous application of *Chevron* to the Board's interpretation of the same statute, *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 757, we will again apply the *Chevron* framework in reviewing the Board's interpretation of § 114(f)(2)(B)—this time with regard to the Board's application of an effective-competition standard.

2.

Under *Chevron* review, we first assess whether the statute directly speaks "to the precise question at issue" so as to foreclose (or compel) the agency's interpretation. *Chevron*, 467 U.S. at 842. If so, we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. But if not, we defer to the agency's resolution of the statute's ambiguity as long as its interpretation is reasonable. *See id.*; *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 757.

a. SoundExchange contends that the Board's application of an effective-competition standard is foreclosed by the statute. The Board reached the opposite conclusion in its determination, reasoning that its effective-competition interpretation is compelled by the statute. We disagree with both propositions.

The notion that § 114(f)(2)(B) either forecloses or compels the Board's effective-competition interpretation stands in

considerable tension with our decision in *Intercollegiate Broadcast System*. There, we rejected an argument by webcasters that the same statute "requires the [Board] to base rates on a perfectly competitive market." 574 F.3d at 757. The statute, we concluded, "does not require that the market assumed by the [Board] achieve metaphysical perfection in competitiveness." *Id.* We said that the "statute speaks only of a 'willing buyer and a willing seller.'" *Id.* That is the standard the Board must "apply in evaluating whether a market benchmark [is] an appropriate model on which to base [its] own rate determination." *Id.* Ultimately, we explained, there is an "inherent ambiguity in the statute's mandate." *Id.*

In *Intercollegiate Broadcast System*, we deemed § 114(f)(2)(B) inherently ambiguous with regard to the degree of "competitiveness" in the "market assumed by the" Board when assessing "whether a market benchmark [is] an appropriate model on which to base [its] own rate determination." *Id.* That description perfectly captures the Board's interpretive exercise in this case. And in *Intercollegiate Broadcast System*, we held that the statute did not require the Board to assume a "perfectly competitive market" when assessing the suitability of a "market benchmark." *Id.* Instead, the statute left that decision to the agency's discretion. Here, by the same token, the statute leaves to the agency's discretion whether to assume an "effectively competitive market" when assessing the suitability of SoundExchange's proposed benchmark rates.

The Board, in nonetheless concluding that § 114(f)(2)(B) compels it to assume an effectively competitive market, located that understanding primarily in the statute's requirement that the Board base the determination of rates "on economic, *competitive* and programming information presented by the parties." 17 U.S.C. § 114(f)(2)(B) (emphasis added); *see* 81

Fed. Reg. at 26,331–32. But the requirement to consider "competitive information" does not say *how* to consider the information. Just as the Board must consider "competitive information" but retains discretion whether to assume a perfectly competitive market, *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 757, it likewise must consider "competitive information" but retains discretion whether to assume an effectively competitive market.

SoundExchange, for its part, contends that § 114(f)(2)(B) compels the Board to adopt rates that would be negotiated in the *actual* market, without any adjustment to account for how the rates might vary if the market were effectively competitive. But as we indicated in *Intercollegiate Broadcast System*, the statute does not compel any particular level of competitiveness, including the level existing in the actual market.

For instance, as the Board suggested in its determination, § 114(f)(2)(B)'s reference to rates negotiated "between a willing buyer and a willing seller" could be understood to allow adjustments to offset the existence of market power: "neither sellers nor buyers can be said to be 'willing' partners to an agreement if they are coerced to agree to a price through the exercise of overwhelming market power." 81 Fed Reg. 26,331 (internal quotation marks omitted). In that sense, "the 'willing seller/willing buyer' standard" can be read to "call[] for rates that would have been set in a '*competitive* marketplace.'" *Id.* at 26,333.

SoundExchange also relies on a separate provision in the Copyright Act that authorizes the Board to consider certain policy objectives when setting rates for services other than webcasting. *See* 17 U.S.C. § 801(b)(1). Congress's express mandate to consider policy objectives in that provision, SoundExchange asserts, means that the absence of any such

mandate in § 114(f)(2)(B) forecloses consideration of external policy objectives vis-à-vis the license for webcasters. But the consideration of market competitiveness under § 114(f)(2)(B) does not involve policy objectives external to that provision's mandate. Rather, it is an implementation of the "willing buyer/willing seller" standard itself.

We thus reject SoundExchange's and the Board's competing efforts to see unambiguous clarity where we have previously seen meaningful ambiguity. In light of "the inherent ambiguity in the statute's mandate," we proceed to "assess the reasonableness of the [Board's] interpretation" under the second step of the *Chevron* framework. *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 757.

b. As we explained in *Intercollegiate Broadcasting System*, the Board, "not this court, bear[s] the initial responsibility for interpreting the statute." *Id.* We perceived "nothing in the [Board's] interpretation to establish unreasonableness" in that case, *id.*, and we reach the same conclusion here.

The Board, as set out above, interpreted the "willing buyer/willing seller" standard to authorize the setting of rates at levels that would prevail in a market characterized by effective competition. The Board's understanding to that effect is reasonable. The Board relied on one of its prior determinations in reasoning that, "[b]etween the extremes of a market with 'metaphysically perfect competition' and a monopoly (or collusive oligopoly) market devoid of competition there exists in the real world . . . a mind-boggling array of different markets, all of which possess varying characteristics of a 'competitive marketplace.'" 81 Fed. Reg. at 26,333 (internal quotation marks and citation omitted). The "willing buyer/willing seller" standard, the Board permissibly

believes, gives it discretion to identify the relevant characteristics of competitiveness on which to base its determination of the statutory royalty rates.

The Board also found support for its interpretation in the statute's integrally associated requirement to consider "competitive information" submitted by the parties. 17 U.S.C. § 114(f)(2)(B). While that obligation does not compel the Board to determine rates through the lens of an effective-competition standard, it does support the Board's decision to do so in its discretion. As the Board explained in its determination, the requirement to weigh "competitive information" is "consistent with the idea that Congress intended to delegate discretion to the [Board] to determine whether the rates [it] set[s] reflect[] an appropriate level of competitiveness." 81 Fed. Reg. at 26,334. In other words, "the statutory charge that the [Board] weigh 'competitive information' indicates that the [Board is] empowered to make judgments and decide whether the rates proposed adequately provide for an effective level of competition." *Id.* And here, the Board believed it was "presented with highly specific facts regarding how to use the impact of steering on rate setting in order to measure and account for the 'complementary oligopoly' power . . . that serves to prevent effective competition" in the interactive-services market. *Id.*

The Board, on that basis, found it necessary to adjust SoundExchange's proposed benchmark rates from the interactive-services market. We see no ground for rejecting the Board's interpretation of § 114(f)(2)(B) giving rise to its decision to adjust SoundExchange's proposal.

C.

We now turn to the Board's decision to set different statutory rates for ad-based and subscription-based noninteractive webcasters. SoundExchange claims that the Board's establishment of different rates for those two services was arbitrary and capricious because the Board inadequately examined the propriety of distinct rates under the approach prescribed by its precedents. We reject that challenge and uphold the Board's decision.

The Copyright Act specifically contemplates the Board's ability to adopt different rates for distinct market segments in the provision of webcasting services. The Act directs the Board to "distinguish among the different types of eligible nonsubscription transmission services and new subscription services." 17 U.S.C. § 114(f)(2)(A). Exercising that authority, the Board has previously set different rates for commercial and noncommercial noninteractive webcasting services. *See* Digital Performance Right in Sound Recordings and Ephemeral Recordings (*Web II*), 72 Fed. Reg. 24,084, 24,097 (May 1, 2007); *Web III Remand*, 79 Fed. Reg. at 23,122. And the express grant of authority to draw distinctions between "nonsubscription transmission services" and "new subscription services," 17 U.S.C. § 114(f)(2)(A), necessarily means the Board can distinguish between nonsubscription services, on one hand, and subscription services, on the other.

In the Board's previous webcaster ratesetting proceedings, it considered rate differentiation between two services to be appropriate when the services occupied "distinct segment[s] of the noninteractive webcasting market." *Web II*, 72 Fed. Reg. at 24,097. The Board examined whether the services compete with each other for listeners, *id.* at 24,098, or whether one service instead "operate[d] in a submarket separate from and

noncompetitive with" the other, *id*. at 24,095. And in ascertaining whether market segmentation exists, the Board looks to a number of factors, including whether comparable agreements have been negotiated in which one service paid a lower rate than the other. *Id*. at 24,097; *Web IV*, 81 Fed. Reg. at 26,319–20.

In its proceedings in this case, the Board decided to distinguish between ad-based and subscription-based services. It recounted the existence of "overwhelming" "record evidence" of a "sharp dichotomy between listeners" willing to pay for subscription services and those instead willing to use only ad-based (and cost-free) services. 81 Fed. Reg. at 26,345. The "bimodal chasm" separating consumers based on their willingness to pay, the Board explained, established a "dichotomized market" as between ad-based and subscription-based services. *Id*. Based on that evidence, the Board determined that "ad-supported (free-to-the-listener) internet webcasting appeals to a different segment of the market, compared to subscription internet webcasting, and therefore the two products [are] differentiated by this attribute." *Id*. at 26,346. The Board then set distinct statutory rates for each service. *Id.* at 26,404–05.

SoundExchange contends that the Board failed to explain its decision to differentiate, instead skipping to the conclusion that distinct rates were appropriate. It is true that the Board did not include its analysis of the difference between ad-based and subscription-based services in the section of its determination entitled "Rate Differentiation." *Id.* at 26,319–23. But the Board's analysis cannot be considered arbitrary based merely on the title of the section in which it is found, and the Board devoted ample attention to the issue elsewhere in the determination. *See id.* at 26,344–46.

SoundExchange argues that the Board's decision to adopt different rates was nonetheless arbitrary because the Board departed from the approach established by its precedents. We see no such inconsistency. In *Web II*, the Board established that the key question in ascertaining the propriety of differentiation is whether the services occupy "distinct segment[s]" of the market or instead compete for listeners. 72 Fed. Reg. at 24,097–98. That question forms the core of the Board's analysis in this case, including its extensive discussion of listeners' divergent attitudes with regard to their willingness to pay for webcasting services. 81 Fed. Reg. at 26,345–46. And the determination concludes on that basis that ad-based services make up "a different segment of the market" than subscription-based services. *Id*. at 26,346. In addition, the Pandora and iHeart benchmark agreements afforded the Board concrete examples of buyers and sellers negotiating lower rates for ad-based services than subscription services, and the Board relied on those benchmarks to establish a lower statutory license rate for ad-based services. *See id.* at 26,356, 26,404–05.

We thus conclude that the Board adequately and reasonably explained its decision to set different rates for ad-based and subscription noninteractive webcasting services.

D.

SoundExchange's final challenge concerns the Board's decision to amend a license term setting forth the requirements to qualify as an auditor that can verify royalty payments. Recall that, in addition to determining rates for the statutory license, the Board also establishes other "terms that would have been negotiated in the marketplace." 17 U.S.C. § 114(f)(2)(B). Since the first webcaster ratesetting, each statutory license has included a term enabling copyright holders to conduct an audit

to verify webcasters' royalty payments. *See, e.g.*, Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings (*Web I*), 67 Fed. Reg. 45,240, 45,276 (July 8, 2002); 37 C.F.R. § 380.6. And since *Web II*, the Board's regulations have provided that, to be "qualified" to conduct the verification process, an auditor must be a certified public accountant. 72 Fed. Reg. at 24,109, 24,111; *see* 37 C.F.R. § 380.7.

A number of parties petitioned the Board to amend that term in the proceedings for this ratesetting cycle. SoundExchange proposed amending the definition of "qualified auditor" to embrace auditors with "specialized experience," even if not a CPA. SX Proposed Findings of Fact 451, J.A. 1252. The National Association of Broadcasters (NAB) and the National Religious Broadcasters Noncommercial Music License Committee (NRBNMLC) made a proposal in the opposite direction: they opposed SoundExchange's proposal to relax the requirements to qualify as an auditor and instead proposed restricting them. Those parties suggested requiring that an auditor not only be a CPA but also be "licensed in the jurisdiction where it seeks to conduct a verification." NAB Proposed Rates and Terms 3, J.A. 146; NRBNMLC Proposed Noncommerical Webcaster Rates and Terms 3 (Oct. 7, 2014), https://www.crb.gov/rate/14-CRB-0001-WR/statements/ NRBNMLC.pdf.

The Board adopted that proposal, defining "qualified auditor" to mean "an independent Certified Public Accountant licensed in the jurisdiction where it seeks to conduct a verification." 81 Fed. Reg. at 26,404, 26,409; 37 C.F.R. § 380.7. The Board explained that the new requirement "provides assurance that the auditor will be accountable and

amenable to local governance in the jurisdiction in which it operates." 81 Fed. Reg. at 26,404.

SoundExchange challenges the Board's revised definition of "qualified auditor" on the grounds that its adoption was unsupported by evidence in the record. The Board's determination relies on the expert testimony of Professor Roman Weil in support of the new licensure requirement. *Id.* at 26,404. SoundExchange objects that Professor Weil's testimony did not speak to in-state licensure in particular. His testimony, however, addressed the benefits of using CPAs due to the application of local standards of professional conduct and oversight. *See* Written Rebuttal Testimony of Roman L. Weil 11–13, J.A. 1098–100. In particular, he noted that CPAs are "governed by the principles, rules, and requirements promulgated by their applicable state accountancy boards," *id.* at 11, J.A. 1098, and "face professional consequences" for misconduct, including the ability of state accountancy boards to "take action with respect to the CPA's license," *id.* at 13 & n.16, J.A. 1100.

To the extent the importance of local boards in governing the conduct of CPAs is not self-evident, Weil's testimony sufficiently brings the point home. And on that basis, the Board reasonably concluded that requiring auditors to be licensed where they practice would ensure that they are subject "to the jurisdiction of the local CPA governing bodies and local courts." 81 Fed. Reg. at 26,404. The Board's explanation, in conjunction with Weil's testimony, establishes that the determination is adequately "supported by the written record." 17 U.S.C. § 803(c)(3).

SoundExchange nonetheless argues that the revised definition lacks support because the Board ignored the existence of CPA "mobility laws." Mobility laws permit CPAs

certified in one state to practice in another state, so long as they submit to the disciplinary authority of the other state. Whatever the force of SoundExchange's objection, however, we cannot set aside the Board's determination on those grounds because SoundExchange failed to present the argument at a time the Board could give it consideration.

As we have explained, a "reviewing court generally will not consider an argument that was not raised before the agency at the time appropriate under its practice." *BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473, 479 (D.C. Cir. 2006) (internal quotation marks omitted). Here, SoundExchange made an argument against the licensure requirement in its request for rehearing. But SoundExchange failed to give the Board the opportunity to address the argument it now presses before us: that an additional licensure requirement is irrational because state CPA "mobility" laws already subject CPAs to the disciplinary authority of the various local jurisdictions in which they practice.

The rehearing request instead merely referenced the existence of CPA mobility laws (in a footnote) to demonstrate that the new requirement differed from requirements generally imposed on CPAs. *See* SX Pet. for Rehearing 9 n.14, J.A. 1269. To be sure, at the time of SoundExchange's rehearing petition, the Board had not yet explicitly referenced Weil's testimony in support of the new licensure requirement. It did so in responding to the rehearing petition. But the Board had adopted the new licensure requirement, which gave SoundExchange the opportunity to object to it on the ground that state mobility laws rendered it unnecessary. Yet while SoundExchange noted the existence of state mobility laws in a footnote in its rehearing petition, it made no suggestion that the laws rendered the new licensure requirement unnecessary. *Cf. BNSF Ry. Co.*, 453 F.3d at 478 (treating claim as forfeited in

part because the claimant "first made the argument in a footnote to its petition for reconsideration" to the agency).

Notably, it remains possible that the Board could interpret its new definition of "qualified auditor" such that CPA mobility laws would serve to "satisfy the local-licensing requirement." Board Br. 60; *see also* NAB Br. 41. The Board has confirmed that SoundExchange can ask the Board to address the issue "on a prospective basis." Board Br. 61. If SoundExchange pursues that course, the Board could clarify its regulation in a manner favorable to SoundExchange in that respect, or could amend the regulation to align with its definition of "qualified auditor" in other ratesetting proceedings.

As a result, SoundExchange might be able to secure its preferred understanding of the "qualified auditor" licensure requirement through other means. Its effort to obtain relief here, however, is unsuccessful.

III.

The final challenge before us, brought by pro se appellant George Johnson, concerns the constitutionality of the Board's determination. During the *Web IV* proceedings, Johnson asked the Board to refer several questions to the Register of Copyrights for resolution, including whether the ratesetting proceeding violated Johnson's "exclusive rights" in his copyrights or his due process rights in his property under the Constitution. Mot. of George Johnson Requesting Referral of Material Questions of Substantive Law 3, J.A. 351. The Board denied Johnson's motion to refer the questions. Johnson then presented his constitutional concerns to the Board after its initial determination, in his petition for rehearing.

The Board rejected Johnson's rehearing petition. The Board found it "difficult to discern [his] argument," stating that, while the petition "seems to suggest that the [Board] gave insufficient weight to copyright owners' exclusive rights," it "does not develop that assertion into a coherent legal argument." Order Denying GEO Motion for Reh'g 5, J.A. 374. The Board further explained that, insofar as Johnson sought "to challenge the constitutionality of the [Copyright] Act," the Board "decline[d] to rule on that challenge." *Id.* The Board explained that the issue had been raised for the first time only on rehearing, that the Board's authority to rule on the Act's constitutionality was unclear, and that the Board would decline to do so in any event "on the basis of such inadequate argumentation." *Id.*

On appeal, Johnson contends that the Board improperly failed to address his constitutional arguments. As the Board correctly argues, however, Johnson did not properly preserve his constitutional challenge. Under the Copyright Act, the Board has "considerable freedom to determine its own procedures." *Settling Devotional Claimants*, 797 F.3d at 1118 (internal quotation marks omitted). The Board has established that "[a] party waives any objection to a provision in the determination unless the provision conflicts with a proposed finding of fact or conclusion of law filed by the party." 37 C.F.R. § 351.14(b). As a result, an argument presented to the Board for the first time at rehearing is considered forfeited. *See Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 760.

Although Johnson requested referral of his constitutional concerns to the Register and quoted general "copyright law principles" in his proposed findings of fact, he did not direct a constitutional argument to the Board until his petition for rehearing. Order Denying GEO Mot. for Reh'g 5, J.A. 374. Under the Board's regulations and precedent, that was too late,

and the Board reasonably denied Johnson's petition for rehearing in part on that basis. *See Settling Devotional Claimants*, 797 F.3d at 1122.

Notwithstanding the Board's denial of Johnson's petition in part on the ground that his arguments were untimely, the Board also gave some consideration to Johnson's arguments on the merits. We thus will do the same.

Johnson contends that the Board set royalty rates so low as to deprive copyright holders of their property rights in violation of the Constitution's Copyright Clause and Due Process Clause. With regard to due process, the Board held an extensive adversarial proceeding in determining the webcasting rates. Johnson had the opportunity to testify, submit exhibits, file motions and statements, and propose his preferred royalty rate. No more process was due. Addressing a similar procedure for setting royalties that was applied by the Board's predecessor, we characterized "the suggestion that the Panel's process fell below the minimum constitutional requirements of the Due Process Clause" as "specious." *Nat'l Ass'n of Broads. v. Librarian of Cong.*, 146 F.3d 907, 929 n.20 (D.C. Cir. 1998) (affirming the Copyright Arbitration Royalty Panel). Johnson has given us no reason to reach a different conclusion here.

The Copyright Clause, U.S. Const. art. I, § 8, cl. 8, is equally unhelpful to him. The clause gives Congress the power to grant copyrights, but the grant of that power has never been understood to require Congress to establish absolute rights in intellectual property. Congress established copyright protections for sound recordings but then created a regime of statutory licenses as a limitation on copyright holders' public performance rights. *See Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 114. The Copyright Clause gives Congress the

responsibility to account for and balance the interests of copyright holders and the public. And with regard to noninteractive webcasting services, Congress made clear that the Board was to approximate rates that would be negotiated in the marketplace by willing buyers and sellers. The Board carried out Congress's design.

\*    \*    \*    \*    \*

For the foregoing reasons, we affirm the determination of the Copyright Royalty Board.

*So ordered.*